**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH**

| | |
|---|---|
| IN RE EX PARTE SEARCH WARRANT APPLICATION IN THE MATTER OF:<br><br>ENVIRONMENTAL PROTECTION AGENCY ADMINISTRATIVE INSPECTION ON UTE TRIBAL LAND<br><br>Chipeta Gas Plant<br>40.038007, -109.420447<br><br>Walker Hollow CS<br>40.1851, -109.3040<br><br>Wexpro Island CS<br>39.9600, -109.7170<br><br>Berry Petroleum LLC and Berry Corporation Facilities<br><br>SM Energy Facilities | **MEMORANDUM DECISION AND ORDER DENYING ADMINISTRATIVE WARRANT FOR ENTRY AND INSPECTION**<br><br>Case No. 2:26-mj-00149-CMR-1<br><br>Magistrate Judge Cecilia M. Romero |

Before the court is the United States' (the Government) *Ex Parte* Warrant (Warrant, ECF 3 as amended) and Application in Support (Application or App., ECF 1). The Government seeks an administrative warrant authorizing agents of the Environmental Protection Agency (EPA) to inspect certain sites located on the Uintah & Ouray Reservation (the Reservation). The Government asserts that the Warrant is necessary because the Ute Tribe (the Tribe) requires that EPA officials apply for an "access permit" before entering the Reservation. The Government believes it does not have to comply with the Tribe's access permit condition. Accordingly, the Government seeks this *ex parte* Warrant authorizing EPA agents to enter the Reservation without applying for an access permit.

1

After considering the Warrant, the Application, and the Government's position as addressed at the February 18, 2026, Zoom conference, the court concludes it is unable to issue the Warrant. If the Warrant merely sought the issuance of an administrative warrant for inspection of the sites to ensure compliance with Clean Air Act (CAA) requirements, the criteria for issuance would be met. *See e.g.*, *In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970, 971 (S.D. Tex. 2025) (explaining administrative warrants allow federal regulatory agencies to gain entry to a business for inspection to identify safety hazards and/or other violations). The Warrant here, however, goes beyond that request. Issuing the Warrant under these circumstances would require the court to resolve an unanswered legal question. Specifically, the court would have to determine whether the Tribe may lawfully impose an access permit as a condition for entry onto the Reservation to perform an inspection under the CAA. Hence, this Warrant presents the court with an unresolved question of law regarding the scope of the Tribe and the Government's authority and the conditions, if any, that the Tribe may impose on federal agencies.

The Government provides no legal authority supporting the claim that an *ex parte* warrant is appropriate for resolving unanswered questions of law, especially not one like the one presented before the court. Resolving the issue requires an adversarial process that involves complete briefing and full consideration of the competing legal arguments, processes that are outside the scope and limited function of an *ex parte* administrative warrant application. Accordingly, the court declines to issue the warrant because doing so would require it to impermissibly decide an unanswered question of law through the issuance of an *ex parte* warrant.

## I.    BACKGROUND

### A.  The Warrant Application

The Government seeks an *ex parte* administrative warrant for entry and inspection pursuant to 42 U.S.C. § 7414 (App. at 1). Specifically, the EPA wishes to inspect certain sites on the Reservation to ensure compliance with the CAA (*id*. at 2). The CAA sets many requirements for stationary sources of pollution, including New Source Performance Standards (NSPS) and Title V permit requirements (App. at 5 (citing 42 U.S.C. § 7411; 42 U.S.C. § 7661a(a)).

The EPA may delegate its authority to States, Tribes, and local agencies to implement certain CAA programs, including permitting and compliance issues (*id*. at 6 (citing 42 U.S.C. §§ 7601(d), 7411(c), 7661a(d); 40 C.F.R. §§ 49.6, 71.10)). Where no such delegation has occurred, the EPA implements the program itself (*id*. (citing 42 U.S.C. §§ 7661a(d)(3) and 7601(d)). The EPA has also established a CAA Compliance Monitoring Strategy that directs inspectors to monitor major facilities with Title V permits every two years (App., Ex. G at 11–12). The EPA indicates no delegation of authority has occurred to the Tribe (App. At 6).

Here, the EPA seeks to inspect the following sites (collectively, the Facilities), which the Government alleges are current sources of pollution subject to Title V permits and/or NSPS:

1) WexPro Company's Island Compressor Station (Island Station),
2) Western Midstream's Chipeta Gas Plant (Chipeta Gas Plant),
3) Harvest Midstream's Walker Hollow Compressor Station (Walker Hollow Station), and
4) Various well sites owned and operated by Berry Petroleum (Berry Facilities) and SM Energy (SM Facilities).

(*see id*. at 2). Each of these facilities is located on the Reservation (*id*. at 6). The EPA last inspected the Chipeta Gas Plant on September 17, 2024, and the Island and Walker Hollow Stations on September 18, 2024 (*id*. at 6). On November 20, 2025, the EPA, Berry Petroleum LLC, and Berry Corporation (Berry) entered into a Consent Agreement to resolve alleged NSPS violations

3

regarding the Berry Facilities (*id*. at 7 (citing Ex. H)). The EPA inspectors seek to evaluate Berry's performance with the conditions of the settlement and the SM Facilities' compliance with NSPS (*id.*).

Importantly, the Facilities have not denied EPA access (*id.*). The issue is that the Tribe requires EPA inspectors to obtain an access permit before entering the Reservation. The Government asserts there have been "years of threats by the Ute Tribe to deny access to EPA inspectors, which [have] thus far been resolved through the Tribe acknowledging that EPA did not require Tribal access permits to conduct inspections" (*id*. at 3). The Government now seeks to address this and future "threats" through the issuance of the *ex parte* Warrant.

### B. Brief History of the EPA's Past Contentions with the Ute Tribe

On September 16, 2025, the EPA attempted to perform a CAA inspection of "MPLX's Ironhorse gas plant" but were stopped when Tribal staff from the Energy and Minerals Department told inspectors they needed "to get a Tribal access permit or leave" (App. at 3). That same day, a Tribal attorney forwarded a letter dated September 10, 2025, to the Acting Director of the EPA denying EPA inspectors access to the Reservation (*id.*). EPA officials directed the EPA inspectors to leave the Reservation, and the EPA inspectors departed without performing the inspection (*id.* (citing Attachment A, Wilwerding Decl., ¶¶ 9–13; Ex. D (on the same day CAA inspectors were told to leave, the Tribal Chairman sent a letter dated September 10, 2025, to EPA denying EPA inspectors access to the Reservation))). On December 16, 2025, the EPA inspectors returned, this time with a Bureau of Indian Affairs police escort, but were again interrupted by Tribal officials who asserted that a Tribal access permit was required (*id.*). Despite this interruption, the EPA ultimately resumed and concluded the inspections without an access permit (*id.* (citing Attachment A, Wilwerding Decl., ¶ 19)).

As it relates to the present Warrant, on January 16, 2026, the EPA sent the Tribe an Inspection Coordination Letter describing the CAA inspections planned for February 16–19, 2026 (App., Ex. A). The Coordination Letter invited tribal officials and staff to join EPA inspections and offered briefings on entry and exit procedures (*see id.*). Tribal staff responded on February 9, 2026, stating that if the EPA inspectors wanted access to the Reservation, "[they] would need to apply for an access permit through the Tribal Business Committee" (App., Ex. B). The next day, the EPA emailed attorneys for the Tribe, the Ute Indian Tribe Chairman, and all members of the Tribe's Business Committee indicating "that EPA inspectors [were] not required to obtain Tribal access permits and requiring that the Tribal attorney's confirm by close of business Thursday, February 12, 2026, that the Tribe would allow access to the Reservation for the EPA's CAA inspections the following week" (App., Ex. E). After not receiving a response, the EPA again emailed Tribal authorities on February 13, 2026, stating that if a response were not received by 12:00 p.m. that same day, the EPA would interpret the Tribe's silence as constructive denial of access (App., Ex. F). Based on the information before the court, it appears that Tribal authorities have not responded to date.

Given the history regarding the requirement of obtaining an access permit, the Government has determined that the Tribe "denied EPA inspectors access to perform CAA inspections—in person, by formal letter, and constructively" (App. at 4). Accordingly, the Government seeks an administrative warrant pursuant to 42 U.S.C. § 7414, authorizing the EPA and its agents to enter the Reservation and conduct CAA inspections, and to use the United States Marshals Service if necessary (*id.*).

On February 18, 2026, during a Zoom conference, the court heard the Government's position regarding the substance and scope of the Warrant. The court raised issues regarding the

relevant statutory and case law authorizing the Government to ignore the Tribe's access permit requirement and asked for direct authority to resolve the issue. The Government conceded there is no direct authority. In addition, the court raised concerns about the scope of the proposed Warrant (ECF 1-2), specifically regarding certain provisions regarding the private questioning of individuals and the use of force. That same day, the Government's counsel sent the undersigned supplemental information and a revised proposed Warrant (ECF 3) that removed the use of force and/or detainment.[1] After considering the revised Warrant, the Application in support of the Warrant, and the positions raised during the Zoom Conference, the court denied the issuance of the Warrant for the reasons stated below.

## II.    ANALYSIS

### A. The EPA retains authority to implement Clean Air Act programs on the Uintah & Ouray Reservation.

As indicated above, the EPA may delegate its authority to implement certain CAA programs, but where no such delegation has occurred, the EPA implements the program itself. App. at 6 (citing CAA §§ 502(d)(3) and 301(d); 42 U.S.C. §§ 7661a(d)(3) and 7601(d)). This principle also applies to Tribes that do not seek EPA approval to implement CAA programs. *U.S. v. Questar Gas Mgt. Co.*, No. 2:08-CV-167-TS, 2011 WL 1793164, at *5 (D. Utah May 11, 2011) ("As has been made clear in both statute and case law, if the Tribe does not implement CAA programs on the reservation, the authority to do so reverts to the EPA. Here, neither the Tribe nor the state has been authorized to implement CAA programs on the reservation."). The Application states that because the Tribe has not sought approval to implement CAA programs, the EPA retains

---

[1]While revisions were made to the Warrant, the amended Warrant indicates the Marshals are authorized to assist the EPA "as may be reasonably necessary and appropriate to execute this warrant and all the provisions contained herein pursuant to 29 U.S.C. § 561 eq seq." (ECF 3 at 3). In addition to the concerns addressed herein, the court also has concerns regarding the meaning and scope of this language given warrants are to be particular and narrowly tailored.

full authority to implement CAA programs on qualifying facilities located on the Reservation, and to inspect such facilities (Ap. at 6). To the extent that the Tribe has not sought approval to implement CAA programs, the court finds that the authority to administer CAA programs on the Reservation lies with the EPA.[2]

### B. The Government is authorized to seek an *ex parte* administrative warrant to inspect the Facilities.

In addition to establishing that the EPA has authority to implement CAA programs on the Reservation, the Application explains the statutory framework and case law establishing EPA inspectors' access rights under CAA § 114(a)(2) (App. at 7–8). The Application also cites cases in which neighboring Circuits have granted the Government administrative warrants to conduct CAA inspections and found that *ex parte* administrative warrants are appropriate (*id*. at 7–8, 10–11). The Application also sufficiently establishes that the Facilities are subject to the CAA's regulatory programs and subject to EPA inspections (*id*. at 8). As such, the court finds that the CAA grants EPA inspectors access rights, the Facilities are subject to CAA inspections, and an *ex parte* administrative warrant is an available remedy when access is denied.

Moreover, in *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978), the Supreme Court when dealing with an Occupational Safety and Health Administration (OSHA) inspection warrant, determined that for purposes of administrative warrants, "probable cause justifying the issuance

---

[2] The finding that the EPA retains authority to implement CAA programs on the Reservation is consistent with this court's ruling in *Questar Gas*, 2011 WL 1793164, at *4. In *Questar Gas*, the government brought an action against Questar Gas for CAA violations at five natural gas compressor stations all "located within the historic boundaries . . . of the Uintah and Ouray Indian Reservation known as the Uncompahgre Reservation." *Id*. at *1. Because the regulated facilities were located on the Reservation, the Ute Indian Tribe of the Uintah and Ouray Reservation intervened seeking additional remedies from Questar Gas. *See id*. This court determined that the Ute Tribe "has the ability to be involved in the regulatory process under the CAA but has chosen not to[.]" *Id*. at *5. Thus, until the Ute Tribe receives EPA authorization to regulate, develop, and implement its own CAA programs, "the EPA is the primary enforcer of the CAA in 'Indian Country.'" *Id*. at *5. Although this decision was entered in 2011, the Application asserts that to date, the Ute Tribe has not sought EPA approval to implement CAA programs (App. at 6). As such, the court finds that the ruling in *Questar Gas* regarding the EPA's authority to implement the CAA on the Reservation is still applicable.

of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'" *Id.* at 320–21 (quoting *Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523, 538 (1967)).

Here, the Application establishes that three of the Facilities are major sources of pollution with Title V permits (App. at 6), and that the EPA has a CAA "Compliance and Monitoring Strategy" that directs inspectors to monitor major facilities with Title V permits every two years (App., Ex. G at 11–12). The EPA last inspected the Chipeta Gas Plant on September 17, 2024, and the Island and Walker Hollow Stations on September 18, 2024 (App. at 6), thereby making the proposed inspections of these facilities consistent with the EPA's administrative standards for conducting inspections every two years. Inspection of the Berry and SM Facilities is also consistent with the EPA's administrative standards, as both are subject to NSPS compliance, and necessary to evaluate Berry's compliance with the conditions of the Consent Agreement aimed at resolving Berry's alleged NSPS violations (*id*. at 7).

The court emphasizes that, were the issuance of this Warrant limited to the issues discussed in Sections A and B above, the court could issue the Warrant. However, the Warrant is not limited to the above issues. Rather, issuing this Warrant would require the court to determine whether the Tribe may lawfully impose an access permit as a condition for entry to perform a CAA inspection. As explained in more detail below, the court cannot issue the Warrant because doing so would require it to impermissibly decide an unsettled question of law through an *ex parte* warrant.

**C. It is unresolved whether a tribe can lawfully impose an access permit as a condition for entry to perform a CAA inspection.**

The Tribe has told the Government that EPA agents and officials must obtain an access permit before entering the Reservation (App. at 3–4). Here, the Government has neither applied

for an access permit nor been denied one. Rather, the Government is asking the court to find that it need not comply with the Tribe's access permit requirement. As explained below, the Government presents the court with compelling claims in support of its position, but ultimately, the case law and statutes cited by the Government do not make clear whether it must comply with the Tribe's access permit requirement.

In support of its position, the Government asserts that CAA inspection requirements are generally applicable (App. at 9 (citing CAA §§ 502(d)(3) and 301(d); 42 U.S.C. §§ 7661a(d)(3) and 7601(d))). Because CAA inspection requirements are generally applicable, the Government cites *Matter of Yakama Forest Products*, No. CV-10-3004-EFS, 2010 WL 11512282 (E.D. Wash. Feb. 3, 2010), which states:

> A federal law of general applicability that is silent about Native American tribes applies to them unless 1) the law touches an exclusive right of self-governance; 2) application of the law to tribes would abrogate rights guaranteed by treaties; or 3) there is proof by legislative history or some other means that Congress intended the law not to apply to Native Americans.

*Id.* at \*2 (citing *Donovan v. Coeur d'Alene Tribal Farm*, 751 F.2d 1113, 1115 (9th Cir. 1985)). In *Yakama Forest*, the Yakama Nation attempted to exclude OSHA inspectors from Tribal land. *Yakama Forest*, 2010 WL 11512282, at \*3–4. The Yakama Nation cited a treaty between the tribe and the federal government that included the right of exclusion to justify its refusal to allow OSHA inspectors entry. *Id*. at \*4. The United States Court of Appeals for the Ninth Circuit rejected this argument, holding that application of the treaty's general right of exclusion would effectively nullify all generally applicable federal laws. *Id*. at \*5.

The Government argues the Tribe's insistence that EPA inspectors obtain access to permits before entry under CAA § 114 is: (1) like the assertion of a general right of exclusion, which the

Tribe relinquished in treaties and the CAA otherwise abrogates; and (2) is a requirement which the EPA is not subject to for purposes of carrying out its CAA § 114 authority (App. at 9–10).

The court's primary concern with the first point is that the present case is distinguishable from the general right of exclusion in *Yakama Forest*. Here, the Tribe is not "excluding" the EPA from the Reservation but rather requiring it to seek an access permit before entry. The Application does assert that the Tribe has "denied EPA inspectors access to perform CAA inspections—in person, by formal letter, and constructively" (*id*. at 4), but the Application fails to establish that the Tribe's actions are equivalent to the general right of exclusion as in *Yakima Forest*.

Regarding in-person denial of access, the Application establishes that on September 16, 2025, the EPA could not conduct its CAA inspection because Tribal authorities stopped the inspectors and told them "they needed to get a permit or leave" (*id*. at 3). On December 16, 2025, the EPA was again told that it needed an access permit, but was nonetheless permitted to conduct its CAA inspection (*id*. at 3). These facts do not establish that the Tribe has instituted a "general right of exclusion" like *Yakima Forest*, especially because the EPA was permitted to conduct its December 16, 2025, inspection despite not having a permit. Furthermore, the application does not sufficiently establish that the Tribe's February 9, 2026, email reaffirming its access permit requirement, along with its subsequent silence on the issue, constitutes a denial of access by formal letter and/or constructively. Upon these facts, the court cannot conclude that the Tribe's access permit requirement is equivalent to a general right of exclusion.

During the Zoom conference, the court raised this issue and asked the Government's counsel for cases with similar facts to those in the present case, but counsel affirmed they could not find any and redirected the court to *Yakima Forest* and the two United States treaties entered into by the Tribe. The Government cites two treaties: (1) the 1863 Treaty with Utah, 13 Stat. 673,

10

providing access "to all persons who may be legally authorized by the U.S. to pass through their reservation"; and (2) the 1868 Treaty with the Ute, 15 Stat. 619, stating that the Tribe cannot exclude "employees of the Government as may be authorized to enter upon Indian reservations in discharge of duties" (collectively, the Treaties) (App. at 10 n.38).

Regarding the Treaties, the Government claims the Tribe has relinquished its right to "exclude" persons authorized by the United States to pass through the Reservation or to enter upon the Reservation in discharge of duties. The Government, however, fails to establish that the Tribe's access permit requirement is a per se "exclusion" of authorized persons.

Turning to the Government's second claim, the Government contends that it need not comply with the Tribe's access-permit requirement because such a permit is not mandated for the EPA to exercise its authority under CAA § 114 (App. at 10). In support, the Government relies on *United States v. Fourpoint Resources, LLC*, No. 2:24-CV-00723-RJS-DBP, 2025 WL 2194058 (D. Utah Aug. 1, 2025), appeal docketed, No. 25-4121 (10th Cir. Sep. 23, 2025). In *Fourpoint*, the dispute concerned an agreement between the EPA and the Tribe requiring the EPA to "consult" with the Tribe before referring civil enforcement matters arising on the Reservation. *Id*. at *1. The Government filed suit against Ovintiv USA, Inc., and the Tribe moved to intervene, alleging the EPA had violated the agreement by failing to consult with the Tribe. *Id*. at *2. The court denied intervention, finding the Tribe lacked Article III standing. *Id*. at *3–7.

Of importance here is the brief discussion regarding one of the Tribe's arguments for standing. The Tribe argued it had standing because the Tribal Business Committee had adopted the agreement into binding tribal law through ordinance. *Id*. at *7 n.35. The court, however, rejected this argument. In doing so, the court explained that converting the agreement into binding tribal law had no consequence because the Tribe could not enforce tribal law against the United

11

States since "tribes are subject to plenary control by Congress." *Id*. (quoting *Ute Indian Tribe v. Lawrence*, 875 F.3d 539, 542 (10th Cir. 2017)).

At the Zoom conference, the Government argued, as in *Fourpoint*, that the Tribe's access-permit requirement seeks to impose tribal law on the federal government, a power that Congress's plenary authority prohibits. While this argument may have merit, relying on this principle in an *ex parte* warrant process is overly broad and not clearly supported by case law, given that the interpretation rests on a footnote from a case addressing standing and currently on appeal. *Fourpoint* also underscores that issues regarding sovereignty and standing should be litigated through the adversarial process, not through an *ex parte* administrative warrant.

Whether the Tribe may require an access permit before EPA inspectors enter the Reservation remains unsettled. Resolving this sovereignty issue would extend beyond the limited function of an *ex parte* administrative warrant. Accordingly, the issue cannot properly be decided through the Government's Warrant, and as such, the undersigned finds that the requested Warrant cannot be issued at this time.

### III.    CONCLUSION AND ORDER

For these reasons, the court hereby DENIES issuing the requested Warrant.

IT IS SO ORDERED.

DATED this 13 March 2026.

_____
Magistrate Judge Cecilia M. Romero
United States District Court for the District of Utah